IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| JASMIN LONG, as parent and natural guardian of J.L., a minor,<br><br>Plaintiffs,<br><br>vs.<br><br>SOFIA PRODUCE d/b/a TRUFRESH; and SAM'S EAST, INC. d/b/a PENSACOLA SAM'S CLUB,<br><br>Defendants. | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Jasmin Long, as parent and natural guardian of J.L. (the "Minor") brings this action against Defendants Sofia Produce d/b/a Trufresh and Sam's East, Inc. and alleges:

**PARTIES**

1. Plaintiff Jasmin is the parent and natural guardian of her son, J.L. (the "Minor"). Plaintiff, the Minor, and Plaintiff's husband/the Minor's father reside in the city of Pensacola, county of Escambia, state of Florida.

2. Defendant Sam's East, Inc. d/b/a Pensacola Sam's Club ("Sam's Club") is a corporation organized and existing under the laws of the State of Arkansas with a principal place of business located in Bentonville, Arkansas. Sam's Club owns and operates a retail store located at 1250 Airport Blvd, Pensacola, Florida 32504 (the "Store") at which it sold to Plaintiff the adulterated food product that is the subject of this action.

3. Defendant Sofia Produce, L.L.C. d/b/a Trufresh ("Trufresh") is a limited liability company organized and existing under the laws of the State of Arizona with a principal place of business located in Nogales, Arizona. Trufresh was the manufacturer, processor, supplier, packager, importer, distributor, and/or seller of the adulterated food product that is the subject of

1

this action. At all material times, Trufresh sought to distribute its products to Florida and other jurisdictions.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000.00, exclusive of costs, it is between citizens of different states, and the Defendants have certain minimum contacts with the state of Florida such that maintenance of the suit in this district does not offend traditional notions of fair play and substantial justice.

5. Venue in the United States District Court for the Norther District of Florida is proper pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims and causes of action occurred in this judicial district, and because Defendants are subject to personal jurisdiction in this judicial district at the time of the commencement of the action.

## GENERAL ALLEGATIONS

*Salmonella*

6. *Salmonella* is the second most common intestinal infection in the United States. CDC estimates *Salmonella* bacteria cause about 1.35 million infections, 26,500 hospitalizations, and 420 deaths in the United States every year. However, the real numbers are likely much higher as a majority of cases go unreported.

7. *Salmonella* bacteria have many different serotypes. Some serotypes are only found in one kind of animal or in a single place. Others are found in many different animals and all over the world. Some can cause especially severe illnesses when they infect people, while others cause milder illnesses.

8. *Salmonella* infections usually occur when a person eats food contaminated with the feces of animals or humans carrying the bacteria. Nothing about the products look, taste, or smell would warn a consumer that it was contaminated with *Salmonella* bacteria.

9. *Salmonella* outbreaks are commonly associated with eggs, meat, and poultry, but

these bacteria can also contaminate other foods, such as fruits and vegetables.

10. After ingestion, *salmonella* bacteria travel to the lumen of the small intestine, where the bacteria then penetrate the epithelium, multiply, and enter the blood. This infection process – also referred to as the incubation period – typically takes 6 to 72 hours for the onset of symptoms but can take longer than 10 days depending on the amount of *Salmonella* ingested and the health of the host. As few as 15-20 cells of *Salmonella* bacteria can cause infection.

11. Symptoms of *Salmonella* infection, or salmonellosis, range widely and are sometimes absent altogether. The most common symptoms include diarrhea, abdominal cramps, and fever.

12. Typical symptoms of *Salmonella* infection appear six to 72 hours after eating contaminated food, last for three to seven days without treatment, and usually consist of diarrhea, abdominal cramps, fever, bloody diarrhea, vomiting, headaches, and body aches.

13. Complications of *Salmonella* poisoning are more likely to occur among young children and people age 65 or older. Possible complications like reactive arthritis are thought to occur in two to 15 percent of salmonellosis patients. Symptoms include inflammation of the joints, eyes, reproductive organs, or urinary organs. On average, symptoms appear 18 days after infection. Irritable bowel syndrome (IBS) can also be a long-term complication. In rare circumstances, *Salmonella* infections can result in the organism getting into the bloodstream and producing more severe illnesses such as arterial infections (i.e., infected aneurysms), endocarditis, and arthritis.

14. *Salmonella* infections generally last three to seven days and often do not require treatment. People with severe dehydration may need rehydration through an IV. Antibiotics are recommended for those at risk of invasive disease, including infants under three months old. Typhoid fever, a life-threatening illness caused by *Salmonella*, is treated with a 14-day course of antibiotics.

15. Unfortunately, treatment of *Salmonella* has become more difficult as the pathogen has become more resistant to antibiotics. Finding the right antibiotic for a case of *Salmonella* is crucial to treating this bacterial infection.

**The 2023 *Salmonella* Outbreak Associated with Cantaloupe**

16. In or around November 2023, the U.S. Food and Drug Administration (FDA), along with the Centers for Disease Control and Prevention (CDC) and state and local partners, as well as Canadian health officials, began investigating a multistate outbreak of *Salmonella* Sundsvall and *Salmonella* Oranienburg infections. The Public Health Agency of Canada also investigated an outbreak of *Salmonella* illnesses that have a genetic fingerprint closely related to the U.S. outbreak.

17. As of November 28, 2023, there were at least 117 reported cases associated with this outbreak. However, the true number of victims is likely much larger. In addition, additional new cases continue to be added to CDC's and FDA's case-count.

18. Preliminary epidemiological data suggests that illness start dates ranged from October 17, 2023, to November 14, 2023, though additional cases with illness onset dates after November 14, 2023, are likely to be added. Victims of the outbreak ranged in age from less than one year old to 100 years old, with a median age of 64 years. Fifty-nine percent of ill people were male. Approximately 59% of reported cases of people sickened by Defendants' cantaloupe were hospitalized. Two deaths in Minnesota were reported.

19. Public health officials identified Trufresh as the likely source of contaminated cantaloupe in the U.S. and Canada.

20. Trufresh confirmed that cantaloupes that were potentially contaminated with *Salmonella* were distributed to states including Florida.

21. Trufresh recalled all sizes of fresh cantaloupes bearing the "Malichita" Label because they had the potential to be contaminated with *Salmonella*. These recalled cantaloupe were distributed directly to states including Florida as well as Canada.

22. As part of Trufresh's recall, consumers were told to throw away and not to consume, serve, use, sell, or distribute Trufresh's contaminated cantaloupes.

23. In addition, companies that further processed and sold Trufresh's contaminated cantaloupes conducted a recall of their own cantaloupe products, as follows:

| Date | Company | Product |
|---|---|---|
| 11/14/23 | Vinyard Fruit and Vegetable CO. | Cantaloupe chunks and cubes and fruit mixes and medleys containing cantaloupe |
| 11/22/23 | CF Dallas, LLC | Fresh cut fruit products |
| 11/28/23 | Kwik Trip | Fruit cups and trays containing cantaloupe |
| 11/28/23 | Bix Products | Fruit cups containing cantaloupe |
| 11/29/23 | GHGA, LLC | Fruit cups and trays containing cantaloupe |

**J.L.'s Injuries and Damages**

24. The Minor, J.L., loved cantaloupe and ate it regularly.

25. On or around November 24, 2023, Plaintiff purchased a fruit tray containing cantaloupe from the Store.

26. The fruit platter contained cantaloupe manufactured, processed, produced, supplied, packaged, distributed, imported, marketed, and sold by Trufresh that was contaminated with *Salmonella*.

27. The Minor first began feeling ill on or around November 26, 2023. He developed a fever, vomiting, and bloody diarrhea, among other symptoms.

28. Plaintiff took the Minor to the hospital on November 26, 2023, where he was admitted. During his hospital admission, tests were performed that confirmed he had been infected with *Salmonella.* The minor was not discharged from the hospital until November 29, 2023.

29. As a direct and proximate result of consuming the Defendants' contaminated cantaloupe products, the Minor was infected with *Salmonella*, which caused him to develop salmonellosis.

30. As a direct and proximate result of consuming the Defendants' contaminated cantaloupe products, Plaintiff and/or the Minor suffered debilitating and painful gastrointestinal distress. The Minor also suffered and will suffer physical and mental pain, emotional distress, diminished quality of life, embarrassment, disfigurement, and other compensatory and economic damages.

31. As a result of the Minor's salmonellosis, Plaintiff and or the Minor incurred, and will incur, medical bills, including hospital, physician, and pharmacy expenses.

## COUNT I – STRICT LIABILITY

32. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

33. At all times relevant hereto, Defendants were the manufacturers, processors, producers, suppliers, packagers, distributors, importers, marketers, and/or seller of the adulterated food product that is the subject of this action.

34. The adulterated food product that the Defendants manufactured, processed, produced, supplied, packaged, distributed, imported, marketed, and/or sold was, at the time it left the Defendants' control, defective and unreasonably dangerous for its ordinary and expected use because it was contaminated with *Salmonella*, a deadly pathogen.

35. The presence of *Salmonella* on the cantaloupe rendered it unreasonably dangerous.

36. The adulterated cantaloupe reached Plaintiff and the Minor without substantial change in the condition in which it was sold.

37. The adulterated cantaloupe that the Defendants manufactured, processed, produced, supplied, packaged, distributed, imported, marketed, and/or sold was delivered to the Plaintiff without any change in its defective condition, and was used in the manner expected and intended, and was consumed by the Minor.

38. The Defendants owed a duty of care to Plaintiff and the Minor to manufacture, process, produce, supply, package, distribute, import, market, and/or sell food that was not adulterated, that was fit for human consumption, that was safe to consume, and that was free of pathogenic bacteria or other substances injurious to human health. The Defendants breached this duty.

39. There was a marketing defect in the cantaloupe when it left Defendants' possession and control. The cantaloupe was defective because it contained *Salmonella* and Defendants failed to give adequate warnings of the product's dangers that were known or by the application of reasonably developed human skill and foresight should have been known. Defendants also failed to give adequate warnings and instructions to avoid such dangers. Defendants' failure to provide

6

such warnings and instructions rendered the product unreasonably dangerous.

40. The Minor suffered injury and damages as a direct and proximate result of the defective and unreasonably dangerous condition of the adulterated food product that the Defendants manufactured, process, produced, supplied, packaged, distributed, imported, marketed, and/or sold.

41. Defendants are strictly liable for manufacturing, process, producing, supplying, packaging, distributing, importing, marketing, and/or selling defective and unreasonably dangerous cantaloupe and introducing it into the stream of commerce.

## COUNT II – BREACH OF WARRANTY

42. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

43. Defendants are merchants who manufacture, process, produce, supply, package, distribute, import, market, and/or sell cantaloupe, foods made with cantaloupe, and other food products.

44. Plaintiff and the Minor are consumers.

45. Plaintiff reasonably relied upon Defendants' skill and judgment as to whether the product was of merchantable quality and fit for human consumption.

46. Defendants are liable to Plaintiff for breaching express and implied warranties that Defendants made regarding the cantaloupe that Plaintiff purchased and the Minor consumed. These express and implied warranties include the implied warranties of merchantability and/or fitness for a particular use. Specifically, the Defendants expressly warranted, through their sale of food to the public and by the statements and conduct of their employees and agents, that the food Defendants manufactured, process, produced, supplied, packaged, distributed, imported, marketed, and/or sold was fit for human consumption and not otherwise adulterated or injurious to health.

47. The contaminated cantaloupe that Defendants sold to Plaintiff would not pass without exception in the trade and was therefore in breach of the implied warranty of

merchantability.

48. The contaminated cantaloupe consumed by the Minor was not fit for the uses and purposes intended (*i.e.*, human consumption). This product was therefore in breach of the implied warranty of fitness for its intended use.

49. Defendants did not disclaim their warranties regarding the cantaloupe.

50. As a direct and proximate cause of the Defendants' breach of warranties, as set forth above, the Minor sustained injuries and damages in an amount to be determined at trial.

### COUNT III - NEGLIGENCE

51. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

52. Defendants owed to the Minor and Plaintiff a duty to use reasonable care in the manufacture, process, production, supply, packaging, distribution, importation, marketing, and/or sale of their food products, which duty would have prevented or eliminated the risk that Defendants' food products would become contaminated with *Salmonella* or any other dangerous pathogen. Defendants breached this duty and were therefore negligent.

53. Defendants owed Plaintiff a duty to warn and instruct Plaintiff of potentially hazardous and/or life-threatening hazards associated with their food products, including *Salmonella* contamination.

54. Defendants had a duty to comply with all federal, state, and local statutes, laws, regulations, safety codes, and provisions pertaining to the manufacture, process, production, supply, packaging storage, sourcing, packaging, distribution, marketing, and sale of their food product, but failed to do so, and are therefore negligent. Plaintiff and the Minor were among the class of persons designed to be protected by these statutes, laws, regulations, safety codes, and provisions pertaining to the manufacture, process, production, supply, packaging storage, sourcing, packaging, distribution, marketing, and sale of similar food products. Defendants breached this duty and were therefore negligent.

55. Defendants had a duty to properly supervise, train, and monitor their respective

employees, and to ensure that their respective employees complied with all applicable statutes, laws, regulations, safety codes, and provisions pertaining to manufacture, process, production, supply, packaging storage, sourcing, packaging, distribution, marketing, and sale of similar food products. Defendants breached this duty and were therefore negligent.

56. Defendants had a duty to use ingredients, supplies, and other constituent materials that were reasonably safe, wholesome, and free of defects; that otherwise complied with applicable federal, state, and local laws, ordinances, regulations, codes, and provisions; and that were clean, free from adulteration, and safe for human consumption. Defendants breached this duty and were therefore negligent.

57. All of the dangers associated with the cantaloupe contaminated with *Salmonella* were reasonably foreseeable and/or scientifically discoverable by Defendants at the time Defendants placed the adulterated cantaloupe into the stream of commerce.

58. Defendants breached their duties in one or more of the following ways:

   a. Negligently manufacturing, processing, producing, supplying, packaging importing, distribution, and/or marketing the product in such a way that it was sold in an adulterated state;

   b. Failing to properly test their product for the presence of pathogens (including *Salmonella*) before placing it into the stream of commerce;

   c. Failing to prevent fecal matter and other contaminants from coming into contact with the cantaloupe and other food products;

   d. Failing to adequately monitor the safety and sanitation of their facilities;

   e. Failing to adopt and follow proper policies and procedures to ensure its production facilities were safe and sanitary;

   f. Failing to adopt and/or follow good manufacturing practices;

   g. Failing to take reasonable measures to prevent the transmission of *Salmonella* and related filth and adulterants from its facilities and food products;

   h. Failing to properly train and supervise its employees and agents to prevent the

   transmission of *salmonella* and related filth and adulteration from its premises;

  i. Failing to warn Plaintiff and the general public of the dangerous propensities of the product, particularly that it was contaminated with *Salmonella*, despite knowing or having reason to know of such dangers; and

  j. Failing to timely disclose post-sale information concerning the dangers associated with the product.

 59. Defendants had a duty to comply with all applicable state and federal regulations intended to ensure the purity and safety of its food product, including the requirements of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301, *et seq.*) and similar provisions in the Florida Food Safety Act (Fla. Stat. § 500.01 *et seq.*), which means the manufacture, sale, and distribution of "adulterated" food.

 60. Plaintiff and her son the Minor are among the class of people designed to be protected by these statutes, laws, regulations, safety codes or provisions pertaining to the manufacture, distribution, storage, and sale of similar food products.

 61. Under federal and applicable state law, food is adulterated if it contains a "poisonous or deleterious substance which may render it injurious to health."

 62. *Salmonella* is "poisonous or deleterious substance which may render it injurious to health." Because the Defendants manufactured, processed, produced, supplied, packaged, imported, distributed, and/or marketed food contaminated with *Salmonella*, Defendants violated statutory and regulatory duties and are therefore negligent *per se.*

 63. As a direct and proximate result of the Defendants' negligence, the Minor sustained injuries and damages in an amount to be determined at trial.

## PRAYER FOR RELIEF:

 WHEREFORE, Plaintiff requests of this Court the following relief against the Defendants, jointly and severely:

 A. For general damages, in an amount to be proven at the time of trial;

 B. For medical, incidental, hospital, psychological care and other expenses, in an

amount to be proven at the time of trial;

C. For an award of pre-judgment and post-judgment interest as provided by law;

D. For consequential damages, in an amount to be proven at the time of trial;

E. For an award providing for payment of costs of suit;

F. For such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby request a jury trial on all issues raised in this Complaint.

Dated: December 4, 2023

s/Jack J. Fine
#0223700
FINE, FARKASH & PARLAPIANO, PA
622 NE 1st St
Gainesville, FL 32601-5305
Telephone: 352-376-6046
Facsimile: 352-372-0049
jfine@ffplaw.com

and

Raymond J. Trueblood-Konz
*Pro hac vice* application forthcoming
PRITZKER HAGEMAN, P.A.
100 University Ave SE
Minneapolis, MN 55414
Telephone: 612-338-0202
Facsimile: 612-338-0104
raymond@pritzkerlaw.com

*Attorneys for Plaintiffs*